

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

GROVER SELLERS
ATTORNEY GENERAL

Honorable Olin Culberson, Chairman
Railroad Commission of Texas
Austin, Texas

Opinion No. O-6998

Re: Whether it is mandatory upon the
Railroad Commission to fix, pre-
scribe or approve rates for ob-
servance by specialized motor
carriers authorized to transport
livestock, livestock feedstuffs,
and farm machinery, when con-
sidered impracticable to do so
by the Railroad Commission.

Dear Sir:

Your letter of April 23, 1946, requests the
opinion of this Department as follows:

"Dated February 5, 1946, a group of livestock
haulers through their rate agent, O. R. Davis of
Austin, Texas, filed with the Texas Railroad Com-
mission an application for this Commission to pre-
scribe rates, rules and regulations for observance
by Specialized Motor Carriers authorized to trans-
port livestock, livestock feedstuffs, and farm
machinery.

"The Director of the Rate Division of this
Commission presented that application for con-
sideration and he was instructed, after considera-
tion thereof, to advise the petitioners that the
Commission is of the opinion that it should not
assume jurisdiction of, or prescribe rates and
rules for observance by Specialized Motor Carriers
authorized to transport those commodities.

NO COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

"On March 14, the attorney for the Texas Live-
stock Haulers Association addressed a letter to this
Commission, stating that in his opinion the statute
makes it the mandatory duty of the Railroad Com-
mission to prescribe rates, rules and regulations
governing the transportation of livestock, live-
stock feedstuff, farm machinery and the other com-
modities named in Section III, of House Bill 351
by the motor carriers operating under certificates
of convenience and necessity issued by the Com-
mission. Said attorney further stated:

"'It is my opinion that the Commission has
no discretion to exercise in connection with
the question of whether it shall, or shall
not, prescribe the rates, but that the Com-
mission's discretion arises in determining
what the rate, rules and regulations governing
the transportation of such commodities shall
be. No court may substitute its decision
for the Commission's decision as to what the
rates shall be. Unless the rates prescribed
by the Commission pursuant to an exercise of
its discretion are discriminatory or confis-
catory, the courts may not disturb them.'

"Several years ago and long prior to the pas-
sage of H. B. No. 351 by the Legislature in 1941,
motor carriers engaged in transporting such com-
modities operated under special commodity permits
and were not considered or treated by the Commission
as either contract carriers or common carriers.
While such carriers were operating under special
commodity permits, and long prior to the enactment
of H. B. No. 351 by the Legislature in 1941, the
Commission held a hearing upon a petition filed by
interested parties seeking to have rates pre-
scribed for the transportation of the same com-
modities by special commodity permit holders. The
Commission held that hearing and pursuant to con-
sideration thereof entered an order holding that
it was within the Commission's discretion as to
whether it would or would not fix such rates and
because of the practical difficulties involved in
fixing such rates, concluded it should not under-
take to prescribe such rates.

"The general conditions under which livestock are hauled have not changed, but the statute was amended by H. B. No. 351 by the Legislature of 1941, and hence the contention that it is the mandatory duty of the Commission to prescribe such rates and that the Commission has no discretion to exercise with respect to whether such rates shall, or shall not, be prescribed.

"This Commission considered the application of the Texas Livestock Haulers Association, Numbered 1, above referred to, and concluded that it would not assume jurisdiction and would not set the application for hearing, and so advised the petitioners.

"This Commission would like to have your advice as to whether or not in a situation where it believes it is impracticable to fix such rates, the terms and provisions of said statute nevertheless make it the mandatory duty of this Commission to prescribe such rates and whether or not said Livestock Haulers' contention is correct that the Commission has no discretion to exercise in determining whether it shall, or shall not, prescribe such rates."

We will first review the history of legislation pertinent to the subject of your request.

House Bill 335 of the 42nd Legislature (Acts 1931, 42nd Leg., page 480, chapter 277) amended the original motor carrier act of the 41st Legislature (Acts 1929, 41st Leg., chapter 314, page 698; Acts 1929, 41st Leg., 2nd C. S., chapter 24, page 38) and is the present basic common carrier motor carrier law (Article 911b, V. A. C. S.). Section 4 of the 1929 act was amended by the 1931 act to read in part as follows:

"The Commission is hereby vested with power and authority and it is hereby made its duty to supervise and regulate the transportation of property for compensation or hire by motor vehicle on any public highway in this State, to fix, prescribe or approve the maximum or minimum or maximum and minimum rates, fares and charges of each motor carrier in accordance with the specific provisions

Honorable Olin Culberson - Page 4

herein contained, to prescribe all rules and regu-
lations necessary for the government of motor car-
riers, to prescribe rules and regulations for the
safety of operations of each of such motor carriers,
to require the filing of such monthly, annual or
other reports and other data of motor carriers as
the Commission may deem necessary, to prescribe the
schedules and services of motor carriers operating
as common carriers, and to supervise and regulate
motor carriers in all matters affecting the relation-
ship between such carriers and the shipping public
whether herein specifically mentioned or not."
(Article 911b, Section 4(a), V. A. C. S.)

Section 6(d) of the 1931 act provided for what be-
came known as "special commodity permits". The act did not
expressly subject special commodity carriers to the various
requirements of House Bill 335 pertaining to common carrier
motor carriers and as a consequence, special commodity per-
mits became the subject of litigation in our courts which
was pending in 1941.

The 47th Legislature by House Bill 351 (Acts 1941,
47th Leg., page 713, chapter 442; Article 911b, Section 1(1),
5a, 6(d)) supplanted special commodity carriers by creating
a special class of common carrier motor carriers designated
as "specialized motor carriers". Specialized motor carriers
were made subject to the basic motor carrier law by Section 4
of House Bill 351 which amended the original motor carrier
act by adding Section 5a. Subsection (e) of the added Sec-
tion 5a reads:

"(e) Except where otherwise provided, appli-
cations for and holders of certificates of public
convenience and necessity, as provided for in this
Section, shall be subject to all of the provisions
of the Act relating to common carriers by motor
vehicle."

Rates for specialized motor carriers are not "other-
wise provided" in House Bill 351, or elsewhere.

There is a clear and decisive legislative purpose
in House Bill 351 that specialized motor carriers shall be
considered as common carrier motor carriers and subject to
the basic motor carrier law. The caption to the act reads
in part "providing that specialized motor carriers shall

Honorable Olin Culberson - Page 5


be subject to the laws relating to common carriers" and Section 1 of the act reads as follows:

> "Section 1. Declaration of Policy. It is hereby declared to be the policy of the Legislature to create a class of common carrier motor carriers designated as 'specialized motor carriers' to engage in the business of transporting for compensation or hire over the highways in this State over irregular routes on irregular schedules with 'specialized equipment,' oil field equipment, household goods, and used office furniture and equipment, livestock, milk, livestock feedstuff, grain, farm machinery, timber in its natural state, wool, mohair, pipe used in the construction and maintenance of water lines and pipe lines, and in addition, all commodities which by reason of length, width, weight, height, size, or other physical characteristic, require the use of special devices, facilities, or equipment for their loading or unloading, and all commodities which require special facilities or special motor vehicles for adequate, efficient, or safe transportation; to regulate such carriers in the public interest to the end that the highways may be rendered safer for the use of the general public, that the wear of such highways may be reduced, that congestion of traffic on the highways may be minimized, and that the use of the highways may be restricted to the extent required by the necessity of the general public; provide regulation for all common carriers, without unjust discriminations, undue preferences or advantages, unfair or destructive competitive practices; improve the relations between and coordinate transportation by the regulation of such motor carriers — and other common carriers; preserve the common carriers serving the public in the transportation of commodities generally over regular routes; develop and preserve a complete transportation system properly adapted to the needs of the commerce of this State and of the National Defense Program."

Speaking of common carrier motor carriers and specialized motor carriers, the court said in Victory Truck Lines v. Red Arrow Freight Lines, 186 S. W. (2d) 98: "Both of these are treated as 'common carriers' and subject to regulation as such."

Specialized carriers are thus subject to the same

regulations as had obtained with respect to regular common carrier motor carriers, and as if specialized motor carriers had been a part of the original motor carrier acts.

It therefore follows from the specific provisions of Subsection (e) of Section 5a, quoted above, and all the intendments of House Bill 351, that the power, authority, and duty of the Railroad Commission with reference to the promulgation of rates is now identical with reference both to regular common carrier motor carriers and to common carrier specialized motor carriers, and that these carriers are equally subject to the rates prescribed by the Commission.

It is noted that original Section 4 of the 1931 Acts (Article 911b, Section 4) contained Subsection (a), (b) (which was repealed by the 47th Legislature), (c), and (d). Subsection (a) quoted hereinbefore itself enumerates seven duties of the Commission, five of which, including the fixing of rates, are specific. The purpose of Section 4 was to empower and direct the Railroad Commission to regulate common carrier motor carriers, in the various named respects, for the purpose of achieving a sound and integrated motor carrier system in the public interest. Each of the subsections contains the mandatory language "the Commission is hereby vested with power and authority and it is hereby made its duty"; this language is likewise present in original Section 6aa, Section 6, and Section 13a. The duties of the Commission which are specified in these various sections represent forms of regulation considered by the Legislature to be essential and imperative to the accomplishment of the purposes of the act. The duties enumerated are of equal statutory dignity and force; the language used does not permit the construction of some of the duties as permissive--subject to the discretion of the Commission as to whether or not they will be performed--and others as mandatory. If the duties are not considered as mandatory, the positive and active regulation and supervision of common carrier motor carriers in all respects would be left to the sole discretion of the Railroad Commission as to whether or not such regulations would or would not be accomplished. Quite clearly it was not the intention of the Legislature that the Commission would have the discretion to act or not to act in the various named respects, but rather that the Commission would exercise discretion in the manner of acting only.

In Texas Motor Coaches, Inc., v. Railroad Commission, et al, 41 S. W. (2d) 1074, the Austin Court of Civil

Appeals considered the requirement in Sections 6 and 7 of
the Motorbus Act (Article 911a, V. A. C. S.) that the Com-
mission ascertain and determine certain facts prescribed in
the act in connection with an application for a motorbus
certificate of convenience and necessity. Section 6 of the
act contains the identical opening language which, as pointed
out above, is present in the rate section (4(a)) and in other
sections of the motor carrier act (Article 911b): "The Com-
mission is hereby vested with power and authority, and it is
hereby made its duty". The court held that the duties are
mandatory upon the Commission:

> "While the commission is given considerable
> latitude in the manner in which it may proceed to
> ascertain the facts prescribed in the statute as
> prerequisite to the granting of such permit, the
> duties of the commission prescribed in the act are,
> we think, mandatory, * * *"

The same court in Texas & P. Ry. Co. v. Railroad
Commission, 138 S. W. (2d) 927, spoke as follows of the duties
of the Commission under the Motor Carrier Act (Article 911b,
V. A. C. S.):

> "In brief, when the Act is considered in its
> entirety, it imposes upon the Commission the manda-
> tory duty, where the physical structure of the high-
> ways and the safety and convenience of the public
> will permit such transportation of freight for hire
> over them, to so regulate, control, and limit such
> motor transportation to the needs of the public;
> and to so regulate and control same as not to im-
> pair existing operations thereon, whether by private
> carrier or by common carrier. * * *"

Sutherland on Statutory Construction, 3rd Ed.,
Vol. 3, page 86, Section 5808, quotes as follows from the
United States Supreme Court case of Board of Supervisors, Rock
Island Company v. U. S., 4 Wall. (71 U. S.) 435, 446, 18 L.
Ed. 419:

> "Where statutes provide for the doing of acts
> or the exercise of power or authority by public
> officers, and private rights or the public interest
> require the doing of such acts or the exercise of
> such power or authority, they are mandatory, regard-
> less of whether they are phrased in imperative or

Honorable Olin Culberson - Page 8

permissive terms. This rule has been enunciated by the United States Supreme Court, speaking through Mr. Justice Swayne, as follows:  'The conclusion to be deduced from the authorities is, that where power is given to public officers * * *--whenever the public interest or individual rights call for its exercise--the language used, though permissive in form, is in fact pre-emptory.'"

It is well settled that if statutory language is mandatory, there is no discretion in the administrative body touching the question of whether or not the power shall be performed, there being discretion only in the manner of its exercise.  43 Am. Jur. page 77, para. 259.

It is also well settled that the promulgation, observance and enforcement of common carrier motor carrier freight rates is in the public interest.  This has been legislatively, judicially, and administratively recognized and no one would seriously question the validity of this principle.

From all the foregoing, we conclude that the statutes of Texas place the Railroad Commission under a mandatory duty to perform the power of prescribing rates for observance by common carrier motor carriers, including common carrier specialized motor carriers, and that this legislative delegation of power and placement of duty renders it incumbent upon the Commission to fix, prescribe, or approve the maximum or minimum, or maximum and minimum, rates to be observed by specialized motor carriers authorized to transport livestock, livestock feedstuffs, and farm machinery.

We have heretofore observed that the power, authority, and duty of the Railroad Commission with reference to the promulgation of rates is identical with reference both to regular common carrier motor carriers and to specialized common carrier motor carriers.  The essential difference between the two types of carriers is that the regular motor carrier is required to operate over regular routes on regular schedules, whereas the specialized carrier is authorized to operate over irregular routes and with irregular schedules.' In many, if not most, instances the specialized carrier duplicates and is in direct competition with the railroads and regular route motor carriers.  The Commission has of course without exception prescribed rates for observance by the railroads and the regular route motor carriers.  It is at once manifest that if it is practicable for the Commission to prescribe rates for observance by the railroads

Honorable Olin Culberson - Page 9


and the regular common carriers, it would likewise be prac-
ticable for the Commission to prescribe rates for specialized
carriers performing essentially the same transportation ser-
vice. It follows that for the Commission to refuse to do
so in such case would pose the question of unlawful discrimi-
nation against the railroads and the regular route common car-
riers. One of the express purposes of the 1941 specialized
motor carrier act is stated in Section 1, hereinbefore quoted,
as follows:

> "Provide regulation for all common carriers,
> without unjust discrimination, undue pref-
> erences or advantages, unfair or destructive
> competitive practices; improve the relations
> between and coordinate transportation by the
> regulation of such motor carriers and other
> common carriers; preserve the common carriers
> serving the public in the transportation of
> commodities generally over regular routes
> * * *"

To illustrate, we will assume that the specialized
carrier is authorized to transport livestock and livestock
feedstuffs from and to Fort Worth and Sweetwater and that
such carrier transports feed from Fort Worth to Sweetwater
and livestock from Sweetwater to Fort Worth. This carriage
is directly competitive with the railroads and with regular
route motor carriers authorized to operate between these points
and the Commission has prescribed rates for observance by
the railroads and the regular route motor carriers. If the
Commission refuses to prescribe rates for a specialized carrier
in such a case, it is obvious that discrimination will result
and that the specialized carrier would have an undue advantage
and could institute unfair and destructive competitive rate
practices.

In Texas & P. Ry. Co., et al v. Railroad Commission,
et al, 138 S. W. (2d) 927, the Austin Court of Civil Appeals
considered the question of the validity of the action of the
Commission in granting special commodity permits under Sec-
tion 6 (d) of the 1931 act without consideration of the
public convenience and necessity for such service. Section
6(d) of the 1931 act did not expressly make special commodity
carriers subject to the provisions of the Motor Carrier Act
as did the act of 1941 creating specialized carriers. The
court held special commodity carriers nevertheless subject

to the provisions of the act and particular emphasis was placed by the court upon the matter of rate regulation of special commodity carriers. The court assumed the mandatory duty of the Commission to prescribe rates and held that Section 6(d) of the 1931 act would be invalid upon grounds of discrimination in favor of special commodity carriers, and denial to other carriers of equal protection of law, if construed as authorizing the granting of a special commodity permit "without regulation as to rate, and without regard to the ability of existing carriers in this area to render the same service".

The following factors are implicit in the uniform rate system which it was the purpose of the Legislature to achieve through the instrumentality of the Railroad Commission: The public interest in sound, efficient, and solvent carriers; non-discrimination between carriers; the right of individual carriers to charge reasonable rates and to be protected from undercharges, rebates, and unfair competition; minimum use of the highways by the maximum utilization of existing carriers; and the right of the shipping public to uniformity in rates from all carriers for the same transportation service.

We are clear in the opinion that no question of practicability can relieve the Commission of its duty to prescribe rates for specialized motor carriers where rates for essentially the same transportation service have been prescribed for observance by the railroads and by regular route motor carriers.

There are, however, instances where a particular specialized carrier transportation service does not duplicate a rail or motor carrier service and for which the Commission has not prescribed rates for observance by the railroads or by regular route motor carriers. To employ our illustration again, suppose that in addition to the transportation of livestock from Sweetwater to Fort Worth and the feed from Fort Worth to Sweetwater, the specialized carrier goes to a farm or ranch some distance from Sweetwater to pick up the livestock and to deliver the feed. The conditions of this carriage will vary in matters of distance, type of roads, variable weather conditions, types of equipment that will traverse the roads, etc., which present practicable difficulties in the prescription of rates. Nevertheless in

analyzing the short haul problem, the following must be recognized:  First, the short haul partakes of competition with the railroads and regular route common carriers, though less direct, in that this added service enables the specialized carrier to secure the long haul business; second, if rates are not prescribed for the short haul, specialized carriers will be subject to unrestrained "bidding for the business" among themselves; third, the farmer or rancher would have no assurance of certainty or fairness in the rates he would have to pay from time to time; and fourth, if the specialized carrier controls the matter of rates for the short haul, he can in effect undermine the prescribed rates for the long haul (from Fort Worth to Sweetwater in our illustration) by special concessions in the short haul.  Therefore, for the achievement of an orderly and effective rate system, it is essential that rates be prescribed for the complete transportation service.

We assume that the short haul illustration represents the situation in which the Commission believes it "impracticable" to fix rates for the named specialized motor carriers.  "Impracticable", of course, means something between "not easily done" and "cannot be Done".  Not being familiar with the record made in the hearing held several years ago by the Commission or with the record which will be made under the present application, we manifestly cannot categorically answer the question of impracticability.  The law does not, of course, require the doing of an impossible thing, but we construe your letter as not intending to state that the fixing of rates for the named specialized motor carriers would be impossible.  We are of the opinion that facts of difficulty and "not easily done" would not relieve the Commission of the obligations of the mandatory duty under review, and that if capable of accomplishment, it is the legal duty of the Commission to fix, prescribe, or approve the maximum or minimum, or maximum and minimum, rates for observance by specialized motor carriers authorized to transport livestock, livestock feedstuffs, and farm machinery.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By Zollie C. Steakley
Assistant

APPROVED JULY 10 1946

ZCS:

ATTORNEY GENERAL OF TEXAS

APPROVED
OPINION
COMMITTEE
BY BWB